**Vicki G. NEWBERG, Acting Director of Special Fund, Appellant,**

v.

**Jimmy Reed CHUMLEY; Scotts Branch Coal Company; Ronald W. May, Administrative Law Judge; and Workers' Compensation Board, Appellees.**

No. 91–SC–581–WC.

Supreme Court of Kentucky.

Feb. 13, 1992.

David Randall Allen, Labor Cabinet, Special Fund, Louisville, for appellant.

Jonathan Stanley, Wilson & Stanley, Lexington, for Jimmy R. Chumley.

Paul E. Jones, Pikeville, for Scotts Branch Coal Co.

OPINION OF THE COURT.

Jimmy Reed Chumley filed a claim for total disability benefits due to coal workers' pneumoconiosis. Subsequently he entered into a settlement with his last employer and received a lump-sum payment of $22,000 for the release of any claim against the employer. Claimant reserved the right to proceed against the Special Fund. The settlement was approved by the Administrative Law Judge (ALJ) on January 23, 1990.

On March 15, 1990, the Opinion and Award rendered by the ALJ found claimant to be totally occupationally disabled under KRS 342.732(1)(c) based on category 1 radiographs and the presence of respiratory impairment as indicated by FEV1 spirometric testing values of less than 55%. The largest FVC value, however, was greater than 55%. The award was apportioned, placing 75% of the liability on the Special Fund. As a result, the Special Fund was ordered to pay the sum of $247.90 per week, beginning April 30, 1988, the date of last exposure. This amount equals 75% of an award for permanent, total disability.

On appeal, the Workers' Compensation Board (Board) affirmed the award under KRS 342.732(1)(c), but reversed and remanded pursuant to KRS 342.120 which requires the Special Fund's payments to begin when the employer's liability is extinguished. Where the claimant and his employer have reached a lump-sum settlement, payment of the agreed upon sum extinguishes the employer's liability. *Palmore v. Helton*, Ky., 779 S.W.2d 196 (1989). Language in the Board's opinion, however, could be read to imply that the Special Fund was absolved of liability for benefits which accrued before the settlement.

The Court of Appeals affirmed the award under KRS 342.732(1)(c), but reversed as to the payment scheme, pursuant to claimant's cross-petition, noting that the Special Fund had failed to respond. CR 76.25(9) prohibits a response to a cross-petition in a workers' compensation case without leave of court. The Court of Appeals did have a copy of the Special Fund's brief to the Board regarding this issue, as is required by CR 76.25(4)(d). Furthermore, the Court of Appeals addressed the merits of the issue. Under these circumstances, review by this Court is not precluded.

The Court of Appeals' opinion explained that disability benefits accrue from the date of the last exposure. The court then ruled that the Special Fund should pay $247.90 per week (75% of a total disability award) from the date of claimant's last exposure. The Special Fund appeals as to both issues.

First, we address whether the award was proper under KRS 342.732(1)(c). The ALJ ruled that claimant's radiographs indicated category 1 pneumoconiosis. The largest FVC was 76%; whereas, the largest

FEV1 was 47%. Because the FVC value was greater than 55%, the Special Fund argues that the award of benefits pursuant to KRS 342.732(1)(c) was erroneous. According to the Special Fund, when the language of KRS 342.732(2) is applied to KRS 342.732(1)(c), the result is that all of the spirometric test values must be less than 55%. Therefore, if either the FVC or the FEV1 is greater than 55%, total disability is not to be presumed. The Special Fund also argues that while the ALJ has discretion to pick and choose among the various categories of pneumoconiosis reported by the physicians, the ALJ has no discretion in determining the degree of respiratory impairment.

According to the AMA's *Guides to the Evaluation of Permanent Impairment (Guides)*, upon which the legislature relies in KRS 342.732, spirometry is a forced expiratory maneuver which measures the ventilatory capacity of the lungs and indicates the degree of pulmonary impairment. There are three component parts of the maneuver: forced vital capacity (FVC), forced expiratory volume in the first second (FEV1) and the ratio of these measurements expressed as a percentage (FEV1/FVC ratio). The *Guides* indicate that forced vital capacity (FVC) is a valid and reliable index of significant pulmonary impairment due to interstitial, restrictive lung disease, such as coal workers' pneumoconiosis. An abnormally low forced expiratory volume in the first second (FEV1) indicates an obstructive pulmonary impairment, some causes of which are chronic bronchitis, emphysema, and asthma. The *Guides* note a high correlation between work status and FEV1 values. Because the result of either test is affected by the degree of the patient's cooperation, the *Guides* indicate that the greatest result obtained on each test is the most accurate representation of the actual impairment. The *Guides* also indicate that a patient may suffer pulmonary impairment due to either restrictive or obstructive disease, or due to both. An abnormally low value on either test indicates a respiratory impairment.

According to KRS 342.732(1)(c), total occupational disability benefits are to be awarded to a claimant who has a category 1 radiographic classification and a respiratory impairment as evidenced by spirometric test values of less than 55% of the predicted normal values as found in the *Guides*. KRS 342.732(2) states:

(2) The presence of respiratory impairment resulting from exposure to coal dust shall be established by using the largest forced vital capacity (FVC) value or the largest forced expiratory volume in one second (FEV1) value determined from the totality of all such spirometric testing performed in compliance with accepted medical standards.

KRS 342.316(2)(b)2.b., which governs the admissibility of evidence obtained by spirometric testing, requires that FVC or FEV1 values reported by a physician be the largest obtained from at least three acceptable spirometric maneuvers. The highest value reported by a physician for FVC or FEV1, therefore, represents at least two other values, both of which are less than or equal to the value used in evidence. Where a claimant's highest FEV1 value in evidence is less than 55%, he actually has exhibited at least three FEV1 values of less than 55% to each physician who submitted medical evidence.

We note that KRS 342.732(2) requires that "the largest forced vital capacity (FVC) value or the largest forced expiratory volume in one second (FEV1) value" be used to determine the presence of respiratory impairment resulting from exposure to coal dust. Therefore, in awarding benefits for disability caused by coal workers' pneumoconiosis pursuant to KRS 342.732(1)(c), consideration is not limited to the respiratory impairment caused by pneumoconiosis, as indicated by FVC, but includes consideration of obstructive respiratory impairment, as indicated by FEV1. If we were to interpret the word "or" in KRS 342.732(2) as is urged by the Special Fund, a worker whose largest FVC and largest FEV1 would qualify him for different levels of benefits would be eligible to receive benefits based on the lesser impairment only, regardless of the severity of the other impairment.

The purpose of KRS 342.732 is to establish a scheme of benefits for coal workers who have contracted pneumoconiosis. It is apparent that the legislature intended for the fact finder to consider obstructive impairment, as indicated by the FEV1 value, in determining the degree of compensable disability resulting from exposure to coal dust. KRS 342.732(2). It seems most likely that where a claimant exhibits differing degrees of restrictive and obstructive impairment, the legislature intended to award benefits based on the more severe impairment, regardless of whether it is due to pneumoconiosis or to obstructive airways disease. Therefore, a claimant may be awarded benefits pursuant to KRS 342.732(1)(c) if either his largest FVC or his largest FEV1 value is less than 55% of the predicted normal value.

The Special Fund argues that Chumley's obstructive impairment, as indicated by his largest FEV1 value of 47%, does not result from exposure to coal dust but from his history of smoking cigarettes. This argument was not raised before the ALJ or the Board. The argument to them was, in effect, that where a difference in the largest FVC and FEV1 values would qualify a claimant for either of two levels of benefits, the larger of the two values must be used and the claimant awarded the lower level of benefits. We will, therefore, refrain from addressing the issue further.

Accordingly, because claimant exhibited spirometric test values of less than 55%, we affirm the decision of the Court of Appeals that he is entitled to receive benefits pursuant to KRS 342.732(1)(c).

The remaining issue is the time and manner in which the Special Fund must pay its obligation under the award. As stated by the Court of Appeals, liability for compensation payments due to coal workers' pneumoconiosis accrues from the date of the employee's last injurious exposure. KRS 342.316(1)(b). KRS 342.732 fixes the maximum weekly benefit for which a totally and permanently disabled claimant is eligible. Where both the Special Fund and the employer are liable, KRS 342.120 controls the distribution of that part of the award authorized by KRS 342.732 which falls due during the years which comprise the employee's life expectancy. By operation of KRS 342.120, the employer is liable for payment of the entire weekly benefit until the dollar amount of benefits paid is equal to the percentage of the total award for which the employer is liable. Similar payment by the Special Fund is deferred until the employer's liability is extinguished. Regardless of whether it might be beneficial to the claimant to do so, KRS 342.120 does not authorize an alternative manner of payment.

While KRS 342.120 controls distribution of the award during the claimant's life expectancy, it does not affect the dollar amount to be awarded during that period, nor does this Court's decision in *Palmore v. Helton*, Ky., 779 S.W.2d 196 (1989). Where an employer and employee have arrived at a pre-award lump-sum settlement of a claim which releases the employer from liability and which has been approved by the ALJ, any liability on that claim which may later be assigned to the employer is extinguished upon payment of the agreed upon sum. Such payment also gives rise to an immediate obligation on the part of the Special Fund to commence payment on the portion of the award for which it is liable. *Palmore v. Helton, supra.* The fact that the Special Fund must commence payment at a date earlier than anticipated does not entitle the employee to receive, during his life expectancy, an amount of benefits greater than that which is authorized by KRS 342.732. *Palmore v. Helton, supra,* merely accelerates the date upon which payment must commence and, as a result, the date upon which payment of the amount of benefits which fall due during the claimant's life expectancy is complete. If the claimant should live beyond the age of his anticipated life expectancy, payment would, of course, resume for so long as he lives.

In the case at bar, claimant agreed to release his employer from any liability on the claim in consideration of a lump-sum payment of $22,000. Subsequently, the ALJ determined that claimant was entitled to a lifetime award for total disability bene-

fits, with 75% of that award to be paid by the Special Fund. The remaining 25% of the lifetime award would have been paid by the employer but for the pre-award settlement. Claimant is, therefore, entitled to receive: 1) $22,000, in satisfaction of the employer's 25% portion of the lifetime award, and 2) in satisfaction of the Special Fund's liability, a total disability benefit for 75% of the number of years of his life expectancy. Payment by the Special Fund should commence as of the date the employer's liability was extinguished. KRS 342.120; *Palmore v. Helton, supra.* After payment for 75% of the number of years of claimant's life expectancy, benefits would then be suspended until such time as claimant reaches the age to which the life expectancy tables anticipated he would continue to live. Should claimant live beyond that age, the Special Fund would then be obligated to pay 75% of a total disability benefit for so long as he lives. Because the settlement with the employer was in satisfaction of the employer's entire liability, the obligation for 25% of the claimant's disability expired when the settlement was paid, and no further obligation would arise.

Accordingly, this portion of the case is reversed and remanded for proceedings in conformity with this opinion.

All concur.